UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| CORINA GARCIA ALBARRAN, MARIA LOURDES SEGOBIANO-DE SOTOA, and LUIS MAGANA, Individually and on behalf of a class of others similarly situated,<br><br>    Plaintiffs,<br><br>    v.<br><br>JOHN MORTON, Director, U.S. Immigration and Customs Enforcement, THOMAS G. SNOW, Director, Executive Office for Immigration Review, GREG DOZIER, Commissioner, Georgia Department of Driver Services, BILL HITCHENS, Commissioner, Georgia Department of Public Safety, TIM LEE, Chairman, Cobb County Board of Commissioners, NEIL WARREN, Sheriff, Cobb County Sheriff's Office, INVESTIGATOR SMITH, Georgia Department of Public Safety,<br><br>    Defendants. | CIVIL ACTION<br><br>NO. 1:10-CV-3261-CAP |

**O R D E R**

This action is before the court on motions to dismiss filed by the defendants [Doc. Nos. 48, 49, and 50].

**Factual and Procedural Background**

This is a proposed class action brought on behalf of Hispanic resident aliens to obtain redress for what is alleged to be

systematic violations of their constitutional rights through the application in Cobb County, Georgia of § 287(g) of the Immigration and Nationality Act ("INA").  The § 287(g) Program allows Immigration and Customs Enforcement ("ICE") to enter into agreements with state, local, and tribal law enforcement agencies allowing those agencies to perform certain federal immigration enforcement functions under the supervision of federal officials. Each agreement is formalized through a Memorandum of Agreement and authorized pursuant to § 287(g).  8 U.S.C. § 1357(g).

Each of the named plaintiffs is a foreign national who contends that the defendants repeatedly violated their basic constitutional protections and due process rights on the sole basis of their nationality, which in all three cases is Hispanic.

**I.   Parties**

   **A.   Plaintiff Albarran**

Individual Plaintiff Corina Garcia-Albarran is a native and citizen of Mexico and a resident of Cobb County, Georgia. On March 11, 2010, Albarran was arrested by law enforcement officers of the Cobb County Police Department ("CCPD") on allegations of shoplifting.  Upon her arrest by CCPD officers, Albarran was not read or advised of her Miranda rights, including her right to remain silent, her right to consult with an attorney, or her right to have an attorney present at questioning by law enforcement

officers or personnel. Albarran was taken to the Cobb County Jail and again was not read or advised of her Miranda rights. Albarran's husband posted bond, but the Cobb County Sheriff's Office ("CCSO") continued to detain Albarren while investigating her immigration status. Albarran was not told that her continued detention was for the purpose of an immigration investigation, nor was she informed which members of CCSO questioned her for immigration-related purposes.

After determining that Albarran had entered the United States in 2004 without inspection or authorization, CCSO officers initiated removal proceedings against her. Because this was the first immigration-related proceeding for Albarran, she did not have an attorney "of record" and was not given the opportunity to consult with an attorney at the time of her arrest and subsequent detention. On April 8, 2010, Albarran was released from ICE custody on an immigration bond.

On November 8, 2010, Albarran appeared before the Cobb County State Court for trial on the shoplifting charge. The State dismissed the charges against her.

**B. Plaintiff Segobiano**

Maria Lourdes Segobiano-DeSoto is a native and citizen of Mexico, who first entered the United States with B-2 visitor status sometime in 1998. Segobiano last entered the United States with

B-2 visitor status on or about March 18, 2004, with authorization to remain until September 17, 2004.

In January 2010, Segobiano was involved in a car accident in Cobb County, Georgia. CCPD officers arrived at the scene to investigate. Because she was unable to produce a valid Georgia driver's license, Segobiano was arrested, taken into custody, and charged with Operating a Motor Vehicle Without a Valid Driver's License.  Upon her arrest by CCPD Officers, Segobiano was not read or advised of her Miranda rights, including her right to remain silent, her right to consult with an attorney, or her right to have an attorney present at questioning by law enforcement officers or personnel.

Segobiano was transported by the police to the Cobb County Jail.  Segobiano was detained by and in the custody of the CCSO pending trial or the posting of bond to secure her presence at trial in the approximate amount of $780.  Segobiano was not read or advised of her Miranda rights either upon admission to Cobb County Jail or at any time during her detention there.

Bond was posted, but Segobiano was not released from custody because she was subject to an immigration detainer.  Thus, she remained in custody pending an investigation of immigration status. Segobiano was questioned by CCSO officers concerning her immigration status but was not informed which members of CCSO were

questioning her for immigration-related purposes. She was not told that her continued detention was for immigration-related purposes.

During her detention, Segobiano was allegedly repeatedly harassed and pressured to sign a Form I-826 admitting that she was in the United States illegally and consenting to removal. Segobiano refused to sign the form.

On January 24, 2010, CCSO officers served Segobiano with a Notice to Appear, initiating removal proceedings against her. Because this was the first immigration-related proceeding Segobiano was involved in, she did not have an attorney "of record" and was not afforded an opportunity to consult with attorney.

On August 19, 2010, during immmigration proceedings, Segobiano provided a copy of her I-94 evidencing her legal entry into the United States to the Immigration Court. Segobiano was ordered to produce her original I-94 within one week. However, the original I-94 had been taken from her home the prior evening by an ICE agent.

### C. Plaintiff Magana

Luis Magana is a national of El Salvador and is currently under the protection of the United States government and has been granted Temporary Protective Status by the Department of Homeland Security. He is authorized to work and has received an Employment Authorization Document ("EAD").

Sometime in late 2009, Mr. Magana physically lost his valid Georgia driver's license and sought a replacement driver's license through a visit to Georgia Department of Driver Services ("DDS") on November 25, 2009. After fully processing Magana's replacement driver's license, Georgia DDS personnel confiscated Magana's EAD. The only explanation given to Magana was that he needed to "contact Immigration."

On May 30, 2010, Mr. Magana was issued two traffic tickets by a CCPD Officer. The first was a citation for Operating a Motor Vehicle Without a Valid Driver's License, and the second was a citation for Operating a Vehicle Without a Registration Decal Affixed To the License Place. These matters are pending in the State Court of Cobb County.

In June 2010, Magana returned to DDS with his replacement EAD, which was also confiscated. DDS personnel referred Magana to an Investigator, Daniel Smith, of the Georgia Department of Public Safety ("GDPS"), to ascertain the status of any investigation concerning the confiscation.

On July 19, 2010, CCPD Officers and Investigator Smith sought out Magana at his residence, an apartment complex. The officers were informed by the management office that Magana was in one of two apartments in the building: either the apartment he leased or the apartment leased by his aunt. CCPD officers and Investigator

Smith proceeded—-without a search warrant—-to kick in the door and ransack the first apartment (leased by Magana's aunt). The CCPD officers and Investigator Smith then proceeded to the second apartment and encountered Magana in the hallway.

Investigator Smith identified himself to Magana and proceeded to question him despite knowledge that Magana was represented by counsel in connection with the subject then under investigation. Magana requested his attorney prior to questioning. Investigator Smith utilized a handheld recording device to memorialize both his questions and Magana's answers at the time of the arrest. Once Magana asserted his right to counsel, Investigator Smith turned off the recording device but continued to question Magana outside the presence of counsel. In response to repeated questions, Mr. Magana told Investigator Smith to direct questions to his counsel.

Upon his arrest by CCPD officers and Investigator Smith, Magana was not read or advised of his <u>Miranda</u> rights, including his right to remain silent, his right to consult with an attorney, or his right to have an attorney present at questioning by law enforcement officers or personnel. Magana was arrested and taken into custody and was charged with forgery in the first degree, a felony offense. The premise of this charge is that Magana presented a false EAD to DDS personnel in order to renew his driver's license.

Magana was not read or advised of his Miranda rights either upon admission to Cobb County Jail or at any time during his detention by the CCSO. After bond was posted and Mr. Magana was "released" from criminal detention, he remained in the custody of the CCSO in connection with his immigration status investigation. Magana was never told that his continued detention was in order to determine his immigration status. Magana was not told that CCSO who had questioned him were doing so specifically for immigration-related purposes.

Inside the Cobb County Jail, Magana was coerced to sign a "release" that granted permission to Investigator Smith and the CCPD officers to leave his two-year-old daughter in the care and company of a stranger. Magana claims that he signed the form under duress.

In addition to his EAD, Magana was deprived of access to a Georgia driver's license, and federal immigration authorities have used that wrongful deprivation to attempt to deport Magana from this country.

The felony charge against Magana remains pending in Cobb County.

**D. Defendant Morton**

Defendant John Morton is the Director of ICE and is sued in his official capacity. The plaintiffs have alleged that Morton

failed to supervise and oversee the adequate training of CCSO personnel pursuant to the Cobb INA § 287(g) Agreement. According to the plaintiffs, Morton's failure to oversee has led to the institution of a pattern and practice of policies that have caused the unlawful treatment of the proposed class members by CCSO officers.

### E.  Defendant Hitchens

William Hitchens is the Commissioner of GDPS and is responsible for its overall operations.  Hitchens is responsible for, among other things, ensuring the adequate training, oversight, and supervision of law enforcement personnel in the State of Georgia acting under Georgia's § 287(g) Agreement.  Hitchens is sued solely in his official capacity.

The plaintiffs have alleged that Hitchens failed to adequately supervise and/or oversee the training of Georgia law enforcement personnel pursuant to the Georgia INA § 287(g) Agreement.  The plaintiffs content that Hitchen's failure to supervise and/or oversee has led to the institution of a pattern and practice of policies that have caused the unlawful treatment of the proposed class members by CCSO officers.

### F.  Defendant Dozier

Greg Dozier is the Commissioner of DDS and is responsible for its overall operations.  Dozier is responsible for, among other

things, ensuring the adequate training, oversight, and supervision of Georgia Law Enforcement Personnel acting under the Georgia INA § 287(g) Agreement. Commissioner Dozier is sued solely in his official capacity.

The plaintiffs allege that Dozier failed to ensure that the necessary supervision and oversight needed to guarantee the adequate training of Georgia law enforcement personnel pursuant to the Georgia INA § 287(g) Agreement was provided. The plaintiffs allege that the failure to ensure the provision of adequate oversight has led to the institution of a pattern and practice of policies that have caused the unlawful treatment of the class members by CCSO Officers.

### G.  Defendant Lee

Tim Lee is the Chairman of the Cobb County Board of Commissioners ("CCBC") for the local government of Cobb County. As the Chairman of CCBC, Lee is responsible for, among other things, ensuring the adequate training, oversight and supervision of officials acting pursuant to the Cobb INA § 287(g) Agreement. Lee is sued solely in his official capacity.

The plaintiffs allege that Lee failed to ensure the adequate supervision and/or oversight of CCSO officers pursuant to the Cobb INA § 287(g) Agreement. The plaintiffs contend that Lee's failure to ensure adequate supervision and/or oversight has led to the

institution of a pattern and practice of policies that have caused the unlawful treatment of the proposed class members by CCSO officers.

**H.   Defendant Warren**

Neil Warren is the Sheriff of Cobb County and is the final decision-maker in the CCSO, and is responsible for setting and implementing the policies and practices of the CCSO including, but not limited to, those related to the Cobb INA § 287(g) Agreement. Warren is sued solely in his official capacity.

Warren, on behalf of the CCSO and with the CCBC, is responsible for entering into a Memorandum of Agreement with ICE that purports to authorize enforcement of federal immigration laws by specifically nominated and cross-trained CCSO Sheriff's deputies. Warren, in his role as Sheriff, is responsible for the implementation, administration, and supervision of the Cobb INA § 287(g) program.

The plaintiffs contend that Warren participated in the authorization, planning, and supervision of the actions of the CCSO officers involved in the events described in their first amended complaint. The plaintiffs allege that Warren failed to adequately supervise and/or oversee the training of CCSO officers pursuant to the Cobb INA § 287(g) Agreement. The plaintiffs further allege that this failure to supervise and/or oversee has led to the

institution of a pattern and practice of policies that have caused the unlawful treatment of the proposed class members by CCSO officers.

## II. Counts Contained in the First Amended Complaint

### A. Count I: Unreasonable Search and Seizure

Individual Plaintiff Segobiano and proposed class members assert a claim against Morton, Lee, and Warren based upon the search of Segobiano's home and the seizure of her original I-94 document. Individual Plaintiff Magana and proposed class members assert a claim against ICE, Hitchens, and Dozier based upon the seizure of Magana's EAD and his later arrest without a warrant or probable cause. The individual plaintiffs and proposed class members seek declaratory and injunctive relief.

### B. Count II: Self Incrimination

Individual Plaintiffs Albarran and Segobiano and proposed class members assert a claim against Morton, Lee, and Warren, and Individual Plaintiff Magana and class members assert a claim against all the defendants. These claims are based upon the failure to give the Individual Plaintiffs notification of their <u>Miranda</u> rights at any time during their individual arrests or subsequent detentions. Additionally, Individual Plaintiff Magana claims that he was denied counsel during a custodial interrogation. The plaintiffs seek declaratory and injunctive relief.

### C. Count III: Due Process

The Individual Plaintiffs and proposed class members assert due process claims against Morton, Lee, and Warren based upon the denial of counsel during initial ICE interviews. Additionally, Individual Plaintiff Magana and proposed class members assert that his right to counsel was denied during a custodial interrogation. And Individual Plaintiffs Albarran and Segobiano assert a due process violation on the basis of ICE's failure to follow its own governing statutes and regulations when it failed to exercise discretion in connection with the detentions of these individuals. Finally Individual Plaintiff Segobiano asserts a due process violation arising from ICE, Lee, and Warren's harassment and pressure to sign a voluntary deportation document. The plaintiffs seek declaratory and injunctive relief.

### D. Count IV: "Take Care" Clause

The plaintiffs allege that INA § 287(g) violates the "Take Care" clause of the United States Constitution because it places enforcement power of federal laws in the hands of state officials who implement the enforcement of federal immigration laws without any meaningful Presidential control. The plaintiffs seek declaratory and injunctive relief.

### III. Relief Sought

In the Prayer for Relief contained in the first amended complaint, the plaintiffs seek the following substantive relief:

> Issue an order and judgment declaring that the INA § 287(g) program, as applied through the Cobb INA § 287(g) Agreement and the Georgia INA § 287(g) Agreement, violates the United States Constitution;
>
> Issue an order and judgment declaring that Defendants' policies, practices, acts, and omissions described herein violate Plaintiffs' rights under the Constitution of the United States, and federal statutory law.
>
> Issue an order and judgment permanently enjoining Defendants, their subordinates, agents, employees, and all others acting in concert with them from subjecting Plaintiffs to the unconstitutional and illegal conditions described herein and consistent with the relief requested in the individual Claims, and issue injunctive relief sufficient to rectify those conditions;
>
> Issue an order and judgment permanently enjoining the Defendants from continuing to operate pursuant to any agreement pursuant to INA § 287(g);
>
> Issue an order and judgment permanently engaging [sic] Defendants from delegating INA § 287(g) enforcement responsibilities to the CCPD.

[Doc. No. 40 at pp. 113-114].

### Legal Analysis

The defendants have filed separate motions to dismiss [Doc. Nos. 48, 49, and 50], all of which challenge the plaintiffs' standing to assert the claims raised here and to seek the relief prayed for. Because this issue is dispositive of all claims in

this action and because the defendants have asserted identical positions on this issue, the court will address the standing argument in a single analysis that is equally applicable to all the defendants.

Article III of the Constitution commands that the judicial power of the United States shall extend only to "cases" and "controversies." A party has standing within the meaning of Article III when it establishes three elements: (1) injury, (2) causation, and (3) redressability. <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 560-61 (1992). Unless a party can meet these standing requirements, a federal court has no jurisdiction to hear the case.

In a case in which a plaintiff seeks only injunctive and declaratory relief, the standing analysis requires assessment of whether the plaintiff has sufficiently shown a real and immediate threat of future harm. <u>See</u> <u>City of Los Angeles v. Lyons</u>, 461 U.S. 95, 105 (1983). There must be a credible threat that the injury will be repeated imminently to justify declaratory or injunctive relief. <u>Elend v. Basham</u>, 471 F.3d 1199, 1207, 1208 (11th Cir. 2006).

In this case, none of the three name plaintiffs has shown a real and immediate threat of future harm. The plaintiffs' contentions that state and local officials abuse their authority

under INA § 287(g) by using minor crimes as a pretext to initiate removal proceedings and systematically deny basic due process and constitutional protections to non-citizen Hispanic residents do not allege a future injury that is imminent and concrete enough for judicial consideration.  Moreover, the injuries complained of in this action include unreasonable search and seizure, violations of due process, self incrimination, and violations of the Take Care clause.  There is no allegation that these or similar injuries against these plaintiffs may be repeated in the future.

In response to the motions to dismiss, the plaintiffs contend that their allegations of prior acts and a pattern and practice of unlawful conduct are sufficient to demonstrate a real or immediate threat of future harm.  The Supreme Court case cited in support of this proposition, however, addresses appropriate use of a court's equitable powers, not standing.  See Alee v. Medrano, 416 U.S. 802, 815 (1974).  The Sixth Circuit case relied upon by the plaintiffs does address standing, but it illustrates why the plaintiffs here do not have standing.  See Daubenmire v. City of Columbus, 507 F.3d 383, 383 (6th Cir. 2007)  The Daubenmire court stated, "Plaintiffs' allegations of consistently burdensome and differential past treatment during the permit application process, combined with the fact that Plaintiffs repeatedly engage in and plan to conduct future ceremonial burnings that require them to go

through this process, are sufficient to demonstrate a significant possibility of future harm." Id. (Emphasis added).  The plaintiffs in the instant case have made no allegations that they will be involved in minor criminal offenses in the future that will lead to immigration investigations.  Moreover, such allegation would be implausible because all three of the individual plaintiffs already have ongoing immigration investigations and proceedings.

    The determination that the plaintiffs have no standing in this case is further supported by the reasoning of a recent case from the Middle District of Tennessee.  Renteria-Villegas v. Metropolitan Government of Nashville and Davidson County, No. 3:11-CV-218, 2011 WL 2471585, *9 (M.D. Tenn., 2011).  In that case, plaintiffs challenged the Davidson County Sheriff's Office policy of subjecting every person who entered the Davidson County Jail system to a § 287(g) investigation if that person was or might have been foreign-born.  The court found that at least one of the plaintiffs had standing because there was a future threat of injury.  That plaintiff, Mr. Gutierrez, had been treated differently than other inmates who did not appear to be of Latino origin, and he was automatically classified as a medium security inmate as a result of being placed under an "ICE hold."  Further, the fact that Mr. Gutierrez, who had entered a guilty plea, would again be in Davidson County custody to serve his sentence was

17

sufficient for the court to conclude that the harm would likely be repeated and that he would again be subjected to an interrogation and investigation under the § 287(g) program.

Unlike Mr. Gutierrez in Davidson County Tennessee, the plaintiffs in the instant case have made no allegations that these defendants will have any reason to arrest them again, subject them to the § 287(g) program, and systematically deny them Miranda warnings, access to counsel, and other basic due process and constitutional protections.  Therefore, the plaintiffs have failed to allege that they are under a threat of future harm.

Additionally, the plaintiffs cite to Church v. City of Huntsville, 30 F.3d 1332 (11th Cir. 1994) arguing that it is directly on point.  In Church, a number homeless persons brought a class action suit alleging that the City of Huntsville's pervasive practice or custom of arresting, harassing, or removing homeless people from the city violated those individuals' constitutional rights.  The Eleventh Circuit recognized that past wrongs were evidence of whether there was a real and immediate threat of future harm but went on to rely on the fact that the plaintiffs were homeless involuntarily and could not "'avoid future exposure to the challenged course of conduct'" in which the City engaged.  Id. at 1337.  Thus, the plaintiff's conclusory statement that "the court found standing where the plaintiffs alleged a

custom, practice, and policy of constitutional violations" [Doc. No. 55 at p. 21] ignores the court's crucial observation: the likelihood of future encounters.  Accordingly, the Church case is not on point and does not support the plaintiffs' argument for standing in this case.

Likewise, 31 Foster Children v. Bush, 329 F.3d 1255 (11th Cir. 2003), a case the plaintiffs cite for the proposition that allegations of custom or policy of wrongdoing are enough to show future harm, is different from the instant case in the same critical aspect.  The allegations of past harm when coupled with the fact that the plaintiffs were in the custody of the wrongdoers and could not avoid exposure to the defendants' challenged conduct. Id. at 1267.  There are no facts in the instant case to indicate that these plaintiffs will commit minor criminal violations that ultimately result in the initiation of immigration proceedings against them.  Moreover, the fact that immigration investigations and proceedings have already been initiated against these plaintiffs shows such allegation would be nonsensical.

## Conclusion

Because the plaintiffs have not and cannot allege an imminent threat of future harm, they do not having standing to pursue the relief set forth in the amended complaint.  Accordingly, the

defendants' motions to dismiss [Doc No. 48, 49, and 50] are GRANTED.  The clerk is DIRECTED to close this civil action.

SO ORDERED, this 19th day of October, 2011.

<u>/s/ Charles A. Pannell, Jr.</u>
CHARLES A. PANNELL, JR.
United States District Judge
